COM–SHARE, INCORPORATED, a Michigan corporation, Plaintiff,

v.

COMPUTER COMPLEX, INC., a Delaware corporation, Defendant.

Civ. A. No. 37026.

United States District Court,
E. D. Michigan, S. D.

Nov. 22, 1971.

Donald S. Young, of Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for plaintiff.

Robert A. Hall, Houston, Tex., for defendant.

## OPINION

TALBOT SMITH, District Judge.

The case before us arises out of a dispute between the parties to a contract related to the operation of computers. We have ruled upon (and denied) defendant's motions to dismiss for lack of jurisdiction, for failure to state a claim upon which relief can be granted, and for failure to join an indispensable party. We have heard several days of testimony from the principals, have weighed their respective credibilities, have considered numerous exhibits, and briefs, have heard oral arguments and have considered submitted findings of fact and conclusions of law submitted by both parties. It is our conclusion that the conduct of the defendant has been unconscionable and that a preliminary injunction should issue forthwith for reasons that will be spelled out in detail hereinafter.

Certain background materials are necessary not only to an understanding of the issues (which, legally, are not complicated) but as well to the explanation of certain of the unique meanings given words commonly employed in every day speech. Thus the word "languages", as used in this operation is a collection of programs that individually allow a user to develop programs of his own in a language something like English, but which is susceptible to translation into such computer languages as NEWBASIC, XTRAN, and QED.

The plaintiff, Com-Share, Incorporated, is a Michigan corporation with its principal place of business in Ann Ar-

bor. Defendant,[1] Computer Complex, Inc., is a Delaware corporation, with its principal place of business in Houston, Texas. Computer Complex is the successor to the business, assets, and obligations of Com-Share Southern, Inc., a Texas corporation. It does a continuous and systematic part of its general business within the State of Michigan. Two of the defendant's customers are located within this state. Defendant derived $4,566 (or 0.2%) of its total revenues from customers in Michigan in 1969, $1,017 (or 0.3%) in 1970, and $66,184 (or 2%) in 1971.

The contract between the parties concerned the business each was engaged in, namely, offering the use of computer systems on a "time sharing" basis. This business and its mechanisms are so set up that different customers can use the computer system simultaneously from their places of business through the use of telephone facilities. Both parties are also engaged in developing and marketing what is known as "software". This word, as here employed, refers to the programs and controls which are used in the computer. It is clear that this business of computer time sharing is a fast moving operation. Developments in the technology and improvements thereof are frequently made and are important not only for the service of existing customers but in attracting potential customers for the systems.

The agreement before us, concerning which the dispute arises, was entered into on February 10, 1967 and denominated "Technical Exchange Agreement".[2] The negotiations preceding the Technical Exchange Agreement began in or around January, 1967 and were conducted in part by Mr. William D. Mercer, then President of the defendant, who came to Ann Arbor and Detroit for the purpose of these negotiations, which ultimately resulted in the Technical Exchange Agreement. Defendant's stated objective was to obtain workable systems of time sharing software, plaintiff's subsequent new software developments, and all enhancements, and the maintenance of such software. Summarizing briefly, under the Technical Exchange Agreement, so negotiated, plaintiff and defendant agreed to provide to each other during the term of their agreement, all information concerning "hardware" (e. g., specifications, designs, production drawings, changes, improvements, and new designs relating to computer components) and "software" (i. e., programs and controls that are read into a computer) that came into the legal possession of either party and which related to any phase of operating an SDS 940 Time Sharing Computer System, except that the exchange of applications software in any way proprietary to a user was subject to the express permission of the user. The technology was supplied by magnetic tapes, listings, printouts, and other appropriate transfer media.

From, then, approximately February of 1967 through November 1, 1970, in reliance upon and pursuant to the terms of the Technical Exchange Agreement, plaintiff supplied to defendant, in confidence, from and within the State of Michigan, information, systems software developments and technology called for by the Technical Exchange Agreement, including developments, information, training, knowhow, documents, tapes, tangible things and other technology developed by plaintiff. Such developments and technology as were supplied by defendant to plaintiff under the Technical Exchange Agreement were delivered by defendant to plaintiff in Ann Arbor, Michigan. In addition, certain of the defendant's employees received extensive technical training under the Technical

---

1. We use the word "defendant" herein to refer to Com-Share Southern, Inc., prior to the date on which Computer Complex, Inc., succeeded to Southern's business, and to Computer Complex, Inc., thereafter.

2. This agreement was amended by a written letter agreement dated August 3, 1970.

Exchange Agreement at plaintiff's offices in Ann Arbor.

Consistent with the confidential nature of such developments and technology, the Technical Exchange Agreement specifically provided[3] as follows:

"Com-Share and Southern [now Computer Complex, Inc.] each agreed not to lease, sell or otherwise divulge to any third party interest, without the prior written consent of the other, any and all systems software developments supplied to it by the other."

Further to safeguard the information and data thus supplied, the Technical Exchange Agreement also provided[4] that

"Notwithstanding the expiration or termination of this Agreement, the limitations set forth in Section XI (last paragraph) shall continue for a period of 24 months after such expiration or termination."

Differences having arisen between the parties, they agreed by letter dated November 30, 1970 that the Technical Exchange Agreement was terminated effective as of November 1, 1970. This letter, which was drafted by the defendant, provided in part as follows:

"This letter signifies mutual termination of the Technical Exchange Agreement dated February 10, 1967 between our two companies. This termination shall be effective as of November 1, 1970, as of which date neither company requires further performance by the other under the said agreement."

■ The prayer for a preliminary injunction before us was triggered in large part by the circumstance that on August 5, 1971, defendant publicly announced that it had entered into an agreement with Tymshare, Inc., a California corporation, to sell substantially all of defendant's assets and goodwill related to its computer time sharing operations to Tymshare, Inc. The obligations of Tymshare, Inc. under this agreement, which is dated August 4, 1971, are subject to certain conditions precedent, including the approval of defendant's shareholders. Defendant's shareholders have not yet approved the sale of the assets to Tymshare, Inc., which corporation, we find, is not an indispensable party which must be joined or in the absence of which this action must be dismissed under Fed.R.Civ.P. 19(a) and 12(b) (7). Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183 (1902); Franklin Tp. in Somerset County, N. J. et al. v. Tugwell, 66 App.D.C. 42, 85 F.2d 208 (1936); See, also, Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

The plaintiff, obviously disturbed by the implications of the above with respect to its confidential data, wrote to both defendant and Tymshare, Inc., a letter (August 10, 1971) citing to them the provisions of the paragraphs above quoted of the Technical Exchange Agreement, and stating, in addition, that plaintiff presumed that defendant would not divulge to Tymshare, Inc. any information about or pertaining to the systems software developments which had been supplied to the defendant by the plaintiff. Subsequent thereto, the plaintiff took the action before us. On August 27, 1971 it filed for preliminary and permanent equitable relief. On September 13, 1971 defendant filed motions to dismiss the complaint for failure to state a claim upon which relief could be granted, for lack of jurisdiction, and for failure to join an indispensable party. On October 1, 1971, plaintiff filed its motion for a preliminary injunction restraining and enjoining defendant Computer Complex, Inc., its directors, officers, agents and employees, and all other persons acting in concert with them who receive notice of its order, pending the final determination of this action and thereafter until November 1, 1972, from leasing, selling, transferring, disclosing or otherwise divulging to Tymshare, Inc., its directors, officers, agents, and

---

3. Section XI, last paragraph, page (11).

4. Section XII, paragraph (e), page (13).

employees, or to any other third party, any of the systems software developments and technology supplied by plaintiff to defendant pursuant to the Technical Exchange Agreement.

With reference to the "systems software developments and technology supplied by plaintiff", the record shows that during the period from 1967 to November 1, 1970, plaintiff delivered to defendant, pursuant to the Technical Exchange Agreement, certain magnetic tapes, symbolics, listings, printouts, documents and other items containing or embodying plaintiff's systems software developments and technology as the use of such was made commercially available by plaintiff. Pursuant to the amendment to the Technical Exchange Agreement dated August 3, 1970, plaintiff also delivered to defendant software developments and technology pertaining to the SDS (XDS) 940 computer while such developments and technology were still in the developmental stages prior to their release to plaintiff's customers in a normal time sharing environment. The systems software supplied by plaintiff to defendant under the Technical Exchange Agreement included the following:

(a) The "Monitor" (a collection of programs that combine to control the various operations of the physical hardware devices that comprise the computer) and the "Executive" (a collection of programs that combine to perform administrative functions and interfacing the user to the machine). The "Monitor" and "Executive" programs supplied by plaintiff to defendant were in three separate series: the "C–00" Series, the "T–00" Series and the "W" Series. The "Monitor" and "Executive" programs in the "W" Series were unique and new programs.

(b) The "Languages", which, as we have noted heretofore, is a collection of programs allowing a user to develop programs of his own, in a language which resembles English but which can be translated into language peculiar to the computer, including XTRAN, QED and NEWBASIC.

These systems software developments and technology so supplied by the plaintiff to the defendant were developed by the plaintiff's Research and Development Division at a cost of some two million dollars to the plaintiff.

Some of the history behind the systems software technology for computer time sharing must be noted at this point since it bears upon defendant's claim that there really isn't anything unique about plaintiff's software. Certain of the original concepts had been developed in 1966 at the University of California in Berkeley in a project called "Project Genie" which had been financed by the Federal Government. The systems software developed in this project was identified as System 1.50 and 1.53 and its principal use was in scientific research rather than for commercial time sharing programs.

Also, representatives of plaintiff, Scientific Data Systems, Inc. (commonly referred to as "SDS" and now wholly owned by Xerox Corporation and referred to as "XDS"), and Tymshare, Inc., assisted by faculty and students from the University of California participated in a joint project in 1966 at the facilities of Tymshare, Inc., in Palo Alto, California, for the purpose of developing a commercial version of the software developed earlier at Berkeley for use on a modified SDS 930 computer (later called a 940 computer after certain hardware modifications were made by Scientific Data Systems). This joint project, which was sponsored by Scientific Data Systems (the manufacturer of the SDS 930 computer) resulted in the development of a more commercially oriented system identified as System 1.82. System 1.82 was available to those firms that participated in the joint project, including plaintiff. Mr. Richard Crandall, now plaintiff's president, participated as an employee of plaintiff in this joint project.

Following Mr. Crandall's return to plaintiff Com-Share, Incorporated, in

late 1966, he recruited and assembled a staff of research and development technicians, including Mr. Steven Weiss (later, the principal inventor of the W system technology) and Mr. Ronald Jeffries (later, the inventor of XTRAN), and plaintiff commenced developing and did develop, a number of software systems for use with the SDS 940 computer.

Using separate research and development groups, plaintiff developed software systems along two distinct lines: (1) enhanced versions of System 1.82 (Systems C–00 and T–00) which contained a number of improvements, among the most important of which was the increase in the maximum number of simultaneous users which had theretofore been relatively restricted; and (2) certain totally new software systems, including the W system "Monitor", the W system "Executive", "XTRAN" and Com-Share's version of the "QED" text editor. A great many smaller routines were also developed. The W system Monitor and Executive permit 34 to 40 simultaneous users as compared to the 8 to 10 simultaneous users possible under System 1.82, the 13 to 15 simultaneous users possible under the C–00 system, and the 20 to 25 simultaneous users possible under the T–00 system.

It is our judgment, upon the record before us, that the W system software, XTRAN and plaintiff's version of the QED were invented by plaintiff's employees based upon new principles and concepts with unique engineering, logic and coherence, and did not embody the technology developed by the University of California staff in Project Genie or that developed in the joint project sponsored by Scientific Data Systems. Moreover, with reference to defendant's argument that the software supplied to it by plaintiff was not secret but "instead, in the public domain", it is necessary to note that the existing software systems which are unique in the computer time sharing industry all contain certain elements which perform similar functions and many utilize certain similar fundamental concepts, of a general nature. This is no more than saying that all have a common concept, and, in the most general sense, a common base. Such is common in all engineering. Thus, the concept of vehicular locomotion, involving in one aspect, the basic principles of the internal combustion engine, is common to snowmobiles, ships, airplanes, and automobiles, but there the similarity stops. The varying systems, as patent lawyers so eloquently demonstrate, differ greatly in the steps taken to accomplish the objective. Similarly here. The specific engineering of these software systems, and their particular underlying technologies and design, together with what has been referred to as their "logic and coherence", as well as their speed, accuracy, cost, and commercial feasibility may differ greatly from system to system. They will and do inevitably reflect the peculiar and unique accomplishments and technical skills of the developers thereof. This, in a nutshell, is what the software systems developed by the plaintiff supplied to the defendant under the Technical Exchange Agreement. And while it is true that defendant may have made certain technical changes in software supplied to it by plaintiff under the Technical Exchange Agreement, the defendant did not alter the unique principles, engineering, logic, and coherence developed by plaintiff into such software systems. This software was supplied to the defendant on magnetic tapes in machine readable form known as "selfills" and "symbolics", referred to as "human readable in printed form."

It is clear that the utmost caution was used by plaintiff in protecting the secrecy of this software. Each page of the listings embodying plaintiff's systems contains the words "Com-Share, Inc. Company Confidential." "Passwords", it was testified, are built into the systems to prevent unauthorized access. Magnetic tapes and symbolics are kept locked when not in use. These protections have been built into the systems themselves, not only in order that no customer can have unauthorized access to any other

customer's data base or specialized technology, but also in order that no employee of the company itself can have unauthorized access to any system, and possibly betray his employer and client.

The plaintiff's systems, software development, technology, and their underlying engineering, we find, have been, in fact, kept secret and confidential. Disclosures have been made by the plaintiff only to the defendant, and to plaintiff's foreign licensees. With respect to the "C–00" Series and "T–00" Series software there have been disclosures in isolated instances to certain other firms not in the time sharing business, but such exceptions do not impeach plaintiff's allegations of secrecy. It is clear that plaintiff's software has not been made available to competitor companies in the computer time sharing business.

■ In the conduct of this business, which it is clear is not static, either as to technologies and operations, certain disputes occurred between the parties as to the performance of their respective obligations to exchange technology thereunder. Defendant complains of plaintiff's failure to furnish symbolics, whereas plaintiff established that up to the date of the termination of the Technical Exchange Agreement the defendant had declined to furnish plaintiff with at least one of its hardware design elements, specifically, the "CCI" communications interface device, which would have been of material value to the plaintiff. Defendant argues thus that plaintiff has come into Court with "unclean hands." We do not so find. There is nothing here of morally reprehensible conduct, of acts of such nature that good conscience should not permit the plaintiff to be heard. At the most, there were no more than minor breaches of the contract, neither major nor substantial. It is significant that the parties themselves did not regard such failures as existed as having gone to the root of the contract. At no time prior to November 30, 1970 (the date of the termination letter) nor since that date, has either party threatened to rescind or to commence an action for damages under the Technical Exchange Agreement as a result of any such claims of non-performance. In fact, as of August 3, 1970, the plaintiff and defendant entered into a letter agreement clarifying what were considered by the parties to be ambiguities in the Technical Exchange Agreement. Plaintiff delivered to defendant during the term of the Technical Exchange Agreement substantially all of the technology within its possession or control that was within the scope of the Agreement, and there is no evidence of an anticipatory breach thereof by the plaintiff.

■ We now come to the termination agreement and its bearing upon the contractual obligations of the parties. This termination, by mutual agreement, was evidenced by a letter dated November 30, 1970, prepared by defendant and executed by both parties. The first paragraph of this letter stated as follows:

"This letter signifies mutual termination of the Technical Exchange Agreement dated February 10, 1967 between our two companies. This termination shall be effective as of November 1, 1970, as of which date neither company requires further performance by the other under said agreement."

The defendant argues that the parties intended by this agreement to discharge not only their mutual obligations "to perform under the Technical Exchange Agreement" but also the obligations not to disclose to any third party the software developments supplied to each other by the parties. Thus, it is argued, the very clause designed to prevent disclosure upon termination becomes nugatory upon termination. A more complete exercise in contractual futility would be difficult to find. The purpose behind the non-disclosure provisions is self evident. It is to confine the use of the systems software development, researched and formulated at substantial expense, strictly to the other party, to whom it had been furnished.

The difficulty with defendant's suggested interpretation of the letter, to the effect that it terminates as well the non-disclosure provisions, is simply that it does not say so. An agreement to safeguard sale or disclosure for two years following termination will not be read out of a contract by implication. Nor will it be rendered nugatory by an agreement that there will be no "further" performance under the agreement. Restraint on disclosure is not "further" performance of anything. There can be no "further" performance of a clause that does not come into operation until termination. We find no inconsistency here with the terms of the contract and no ambiguities. But should ambiguity there be, it will be recalled that it was drafted by the same party who now insists that contained within it is a mutually-agreed abrogation of the protective provisions of the contract.

But we are not left solely to the four corners of the instrument. Mr. Crandall, of the plaintiff, took the stand. (It was he who signed the letter on behalf of the plaintiff.) He testified that before he signed the letter he obtained verbal confirmation from Mr. C. H. McCall, then defendant's vice president, that the termination letter did not extinguish the provision of the Technical Exchange Agreement prohibiting the sale, lease or disclosure of the software systems developments or technology supplied by plaintiff to defendant for the 24 month period following the date of termination of the Technical Exchange Agreement.

An affidavit from Mr. McCall was filed in support of defendant's motion to dismiss for failure to state a cause of action, which we denied. In it he does not assert that Mr. Crandall's version of the conversation is in error. Mr. McCall simply doesn't recall any conversation that could be so interpreted. Mr. McCall was not produced at the hearing.

It is our conclusion, having seen and heard the witnesses, received the instruments, and having heard arguments of counsel, that the disclosures we are about to describe, made by defendant, were in wilful and deliberate violation of the terms of the Technical Exchange Agreement and for the purpose of relieving the dire financial distress in which defendant found itself, all at the expense of the plaintiff. The plaintiff has thus stated a claim upon which relief can be granted under Fed.R.Civ.P. 12(b) (6).

Disclosure by defendant, to its vendee, Tymshare, has already commenced. Early in August, 1971, shortly after the agreement between the defendant and Tymshare, Inc. had been executed, defendant commenced disclosure of software technology to Tymshare and, in fact, some of defendant's employees have been working in the facilities of Tymshare, Inc. to implement the disclosure and transfer of the software to Tymshare, Inc.

The software so disclosed was invented and developed by plaintiff, and is its principal business asset and its principal means of retaining and servicing its existing customers and obtaining new customers. The plaintiff regards, and the Court finds that, its software systems developments as secret, confidential and proprietary in nature. (Other companies in the computer time sharing industry, including Tymshare, Inc., also regard their own software as secret, confidential and proprietary in nature.)

The competitive situation in the time shared computer business has a direct bearing on the remedy sought. The standard contracts which plaintiff has with the users of its time shared computer services are cancellable by the users on 30 days' notice to the plaintiff. Approximately 40% of the plaintiff's gross revenues are derived from ten customers, some of whom are also customers of Tymshare, Inc. Approximately 50% to 55% of plaintiff's revenues are attributable to time sharing services sold to customers in the areas of Chicago, Illinois; Los Angeles, California; San Francisco, California; Washington, D. C.; New York, New York; and Bos-

ton, Massachusetts. Tymshare, Inc., is a principal competitor of plaintiff in each of these areas. Defendant is not a competitor of plaintiff in the Chicago, Washington, D. C., and Boston areas, and is not a major competitor of plaintiff in the New York City, Los Angeles and San Francisco areas.

Tymshare, Inc., has revenues of approximately $1,200,000 a month, compared to plaintiff's revenues of approximately $450,000 a month. Tymshare, Inc., has a sales force approximately three times as large as the sales force of plaintiff and a geographic communications coverage that is approximately twice as large as plaintiff's. Tymshare, Inc., presently has 19 XDS 940 computers, as compared to plaintiff's 8 XDS 940 computers. Defendant has 4 XDS 940 computers.

In the event that defendant is permitted to make further disclosure of plaintiff's software to Tymshare, Inc. and in the event that defendant is permitted to transfer title to plaintiff's software to Tymshare, Inc., Tymshare, Inc., in the absence of legal restraint, would have no obstacles to thereafter offering such software to plaintiff's customers.

Both parties assert financial distress. Defendant pleads that should the Court grant the relief requested, it will have to go into bankruptcy. It therefore argues for a money-damage remedy, should plaintiff prevail, though the utility of such a remedy against a financially precariously situated corporation may well be doubtful. Plaintiff, as well, pleads a desperate financial situation, though it does not go to the lengths of asserting impending bankruptcy should relief not be granted. The plaintiff has sustained operating losses every year since its founding in 1966. At the end of its fiscal year ending June 30, 1970, the plaintiff had working capital (i. e., net current assets) of $147,071. At the end of its fiscal year ending June 30, 1971, plaintiff's working capital position was even less favorable. Since June 30, 1970 plaintiff has been unable to obtain bank

or venture capital financing, and plaintiff is dependent upon its operating revenues for the survival of its business. The loss of operating revenues would reduce the plaintiff's cash flow and income to the point where plaintiff would not be able to meet its obligations as they become due and would place plaintiff's business in a position of severe financial jeopardy.

It is clear that in the event that plaintiff would lose customers to Tymshare, Inc., as a result of Tymshare, Inc., offering plaintiff's technology to such customers, the loss of revenues and income therefrom in the future could not be accurately ascertained, nor would it be possible to ascertain the loss of revenues and income that might be attributable to plaintiff's inability to obtain new customers in the future.

■ The above generally summarizes the factual situation emerging from several days of testimony and numerous exhibits. The conclusions of law resulting therefrom are clear. First, as to jurisdiction, the defendant is carrying on a continuous and systematic part of its general business within the State of Michigan and is therefore subject to the exercise of general personal jurisdiction by this Court under Section 711 of the Michigan Revised Judicature Act, M.C.L.A. § 600.711, MSA § 27A.711. Raymond E. Danto Associates, Inc. v. Arthur D. Little, Inc., 316 F.Supp. 1350 (E.D.Mich.1970).

■ The plaintiff's cause of action arises out of defendant's transaction of business within the State of Michigan and defendant is therefore subject to the exercise of limited personal jurisdiction by this Court under Section 715(1) of the Revised Judicature Act, M.C.L.A. § 600.715(1), M.S.A. § 27A.715(1).

■ Moreover, plaintiff's cause of action arises out of a contract that obligated defendant to furnish materials within the State of Michigan and defendant is therefore subject to the exercise of limited personal jurisdiction by this Court under Section 715(5) of the

Revised Judicature Act, M.C.L.A. § 600.715(5), M.S.A. § 27A.715(1).

Although the issue was argued, the Court makes no ruling as to the applicability of Section 751(2) of the Revised Judicature Act, M.C.L.A. § 600.715(2), M.S.A. § 27A.715(2), in the circumstances.

■ We conclude that the defendant has sufficient minimum contacts with and within the State of Michigan so that the assertion of jurisdiction by this Court over defendant with respect to plaintiff's claims does not offend traditional notions of fair play and substantial justice and does not deprive defendant of due process of law under the Fourteenth Amendment to the United States Constitution. McGee v. International Life Ins. Co., 355 U.S. 220, 78 S. Ct. 199, 2 L.Ed.2d 223 (1957); Danto Associates (supra), 316 F.Supp. 1350. ·

■ As to the relationship between the parties and the materials furnished, under the laws of the State of Texas (governing this contract) the Technical Exchange Agreement established a confidential relationship between plaintiff and defendant. Hyde Corp. v. Huffines, 158 Tex. 566, 314 S.W.2d 763 (1958). The systems software developments supplied by plaintiff to defendant were unique property that constituted trade secrets of plaintiff and were supplied to defendant in confidence under the restraints against sale, lease or disclosure set forth in the Technical Exchange Agreement.

The plaintiff has rendered substantial and satisfactory performance of its obligations under the Technical Exchange Agreement.

There has been no anticipatory breach of the Technical Exchange Agreement by plaintiff. Changes may, indeed, have been necessitated by the nature of the operation but did not alter the unique principles, engineering, logic, and coherence developed by plaintiff into its systems software developments.

With respect to the rights upon termination, the letter dated November 30, 1970, providing for the termination of the Technical Exchange Agreement did not, as we have noted, contain terms inconsistent with the provisions of Section XII, paragraph (e), of the Technical Exchange Agreement and did not supersede or negate the provisions of Section XII, paragraph (e).

The letter dated November 30, 1970 between the plaintiff and the defendant which provided that "termination shall be effective as of November 1, 1970, as of which date neither company requires further performance by the other under the said agreement," is interpreted to mean that as of November 1, 1970 neither plaintiff nor defendant required the other to supply technology to the other under the Technical Exchange Agreement.

The provision in Section XII, paragraph (e), of the Technical Exchange Agreement continuing the restraint against lease, sale or disclosure of systems software developments supplied by plaintiff to defendant for a period of 24 months after termination of the Technical Exchange Agreement, was not extinguished or waived by the termination letter dated November 30, 1970; this provision survives the termination of the Technical Exchange Agreement and is interpreted to mean that defendant is restrained from selling, leasing or disclosing plaintiff's systems software developments to any third party prior to November 1, 1972.

■ Moreover, as we have previously commented, if there is any ambiguity as to whether the termination letter dated November 30, 1970 extinguished the provisions of Section XII, paragraph (e), the termination letter must be construed against the defendant, the party that drafted the letter, and in favor of the plaintiff. In addition, we state once more that the Court will not imply the waiver of the explicit contractual obligation of defendant to refrain from selling, leasing or disclosing the systems software developments supplied to it by plaintiff for a period of 24 months after termination of the Technical Exchange Agreement.

We are advised that, technically, the sale to Tymshare has not yet been fully consummated. With respect to this sale, it is our legal conclusion that defendant's sale, lease or disclosure prior to November 1, 1972, of the systems software developments and technology supplied by plaintiff to defendant under the Technical Exchange Agreement would constitute a breach of Sections XI and XII(e) of the Technical Exchange Agreement. Such sections of the Technical Exchange Agreement do not permit the sale in their entirety, nor the piecemeal sale, of the systems software developments and technology supplied by plaintiff to defendant under the Technical Exchange Agreement.

The sale prior to November 1, 1972 by defendant to Tymshare, Inc., or to any other third party, of the systems software developments and technology supplied by plaintiff to defendant in confidence and subject to the terms of the Technical Exchange Agreement, would constitute a wrongful disposition of such developments and technology and would unjustly enrich defendant at the expense of plaintiff.

The sale and further disclosure by defendant to Tymshare, Inc. of the systems software developments and technology supplied by plaintiff to defendant under the Technical Exchange Agreement, will if not restrained, cause plaintiff to suffer substantial and irreparable injury, loss and damage to plaintiff's business for which plaintiff will have no adequate remedy at law.

If the sale and further disclosure by defendant to Tymshare, Inc. of plaintiff's systems software developments and technology is not restrained, plaintiff would suffer damages which would be impossible to calculate and which could not be adequately compensated by money damages, and plaintiff's entire business would be placed in a position of severe financial jeopardy.

The sale and further disclosure prior to November 1, 1972 by defendant to Tymshare, Inc., of the systems software developments and technology supplied by

plaintiff to defendant should be restrained for the reason that plaintiff's systems software developments and technology are unique property and constitute trade secrets of plaintiff and were supplied by plaintiff to defendant in confidence.

That defendant may be in financial difficulty and may not receive the consideration provided under its August 4, 1971 agreement with Tymshare, Inc., if preliminary relief is granted to plaintiff, does not confer upon it a right to breach its contractual obligation under the Technical Exchange Agreement with plaintiff and cannot prevent the issuance of a preliminary injunction in view of the confidential and secret nature of the plaintiff's systems software developments and technology and the threatened irreparable injury and loss to plaintiff.

In balancing the equities, the threatened irreparable injury and loss to plaintiff that would follow upon the sale and further disclosure of plaintiff's systems software developments and technology by defendant to Tymshare, Inc. outweighs any adverse consequences that might result to defendant by reason of the issuance of the preliminary injunction. We are of the opinion, as well, that there is a reasonable and substantial probability that plaintiff will prevail on the merits.

Defendant has argued that the Court is presented with a *fait accompli*, that the transfer of software to Tymshare and incorporations in its system have already started, that the omelet cannot be unscrambled, that equity never decrees a "vain act" and that it would be a "rather apparent [illusory?] victory for them to get an injunction in this case." Plaintiff, on the other hand, argues that the difficulties in enforcement are not insurmountable, that they are, in effect, those encountered in the usual trade secret, proprietary information, case.

We are not persuaded that modern technology has withered the strong right arm of equity. Moreover, difficulties of enforcement often reflect in direct ratio the recalcitrance or lack thereof in the

**1240**

parties affected by the Court's order. We will not anticipate untoward difficulty. At this moment, the first duty of this Court is to issue a preliminary injunction as the only adequate means of preserving the status quo. This injunction shall provide that, to the extent, if any, that defendant is unwilling or unable to extricate changes made by defendant to any software supplied to it by plaintiff, defendant cannot sell, transfer or disclose the whole or any part of that portion of the technology which defendant cannot or will not separate; that the injunction shall restrain and enjoin defendant, its directors, officers, employees, agents, and all other persons acting in concert with them who receive notice thereof, pending the final determination of this action and thereafter until November 1, 1972, from leasing, selling, transferring or further disclosing to Tymshare, Inc., or to any other third party, any of the systems software developments and technology supplied by plaintiff to defendant pursuant to the Technical Exchange Agreement.

A suitable order may be presented.