**In re CNB INTERNATIONAL, INC., Debtor.**

**No. 99–11240 B.**

United States Bankruptcy Court, W.D. New York.

March 30, 2004.

---

Nixon Peabody LLP, Gregory J. Mascitti, of counsel, Rochester, NY, for Amplicon, Inc. dba American Technologies Credit, Inc.

Hodgson Russ LLP, Stephen L. Yonaty, of counsel, Buffalo, NY, for CNB International, Inc.

CARL L. BUCKI, Bankruptcy Judge.

Amplicon, Inc., seeks the allowance of an administrative claim for rent and other payments due under a purported lease of computer software. In challenging this claim, the debtor presents several complex issues. These include the validity of the lease, the standard for calculating administrative liability, and the fair value of access to unused computer software.

At the time of the filing of its bankruptcy petition in 1999, CNB International, Inc. ("CNB"), was a manufacturer and marketer of industrial presses, machine tools, and related parts. Sometime during or about 1997, CNB began negotiations for the acquisition of a new computer system. This system included not only equipment, but also a special software package that had been developed by Symix Computer Systems, Inc. ("Symix"). In anticipation of the delivery of the total package of both hardware and software, CNB and Symix executed a Master License Agreement (the "Master License") on September 30, 1997. The Master License established the terms for CNB's use of selected software products and services. In particular, it provided that "[a]ll trademarks, service marks, patents, copyrights, trade secrets and other proprietary rights in or related to the Products are and will remain the exclusive property of Symix or its licensors." Further, the parties agreed that CNB could "not assign or transfer (by operation of law or otherwise) all or any part of its rights or obligations under this Agreement or any Order, including, without limitation, any License, to any other person, firm or entity without Symix's prior written consent."

To finance both the acquisition of hardware and its license of Symix software, CNB entered into what may be best described as a funding arrangement with Amplicon, Inc. ("Amplicon"), an entity that

at various times in these transactions has done business under the name of American Technologies Credit, Inc. ("ATC"). As part of this arrangement, CNB and ATC executed a lease agreement, whereby ATC purported to lease to CNB the hardware and software that was to be described in certain attached schedules. By its terms, the lease agreement became effective upon its execution by ATC on March 6, 1998. The two schedules of leased property, however, were not attached until on or about March 27, 1998. The first of these schedules specified various equipment, while the second schedule described software, including the software that Symix had licensed to CNB. When it approved these schedules, however, ATC held no right or interest in any of the Symix software. Then on March 30 and April 23 of 1998, ATC paid the respective sums of $508,716 and $90,000 to Symix. In return, ATC received from Symix an acknowledgment of receipt of payment. Nonetheless, as indicated by an acceptance certificate signed by a vice president of CNB, the Symix software was "received and accepted by us as installed, tested and ready for use," effective as of April 20, 1998.

CNB had use of the Symix software for less than a year, when it filed its bankruptcy petition on March 10, 1999. In this court, the present controversy began on July 2, 1999, when Amplicon filed a motion to compel the assumption or rejection of leases and to direct the payment of an administrative expense. Having received no rent during the period from the commencement of bankruptcy through the filing of its motion, Amplicon asserted that the lease agreement should be rejected. Further, Amplicon contended that section 365(d)(10) of the Bankruptcy Code imposed upon the debtor an obligation to pay the contract rate of rent for the period starting on the sixtieth day after the Order for Relief. The debtor responded that in its view, the best interests of the estate required a delay in any decision regarding assumption, until such time as the debtor had exhausted its negotiations for a possible sale of the business. Representing that it was not then using any of the Symix software, CNB contended also that the contract overstated the software's value to the estate. After multiple hearings on the matter, the Court allowed the debtor until October 31, 1999, to assume or to reject its agreements with Amplicon. Absent an assumption by that date, the debtor was allowed use of the equipment and software only through November 30, 1999. Further, as stated on the record on August 30, 1999, the court directed CNB to make adequate protection payments for each week from May 9 (that being the sixtieth day after bankruptcy filing) through November 30. Under the terms of its prepetition agreements with Amplicon, CNB had agreed to pay a monthly rent of $8,216.64 for the use of computer equipment, and a monthly rent of $32,328 for use of software. After noting the debtor's different use of these two types of property, the court mandated adequate protection payments for the equipment in an amount equal to the stated rent, but in an amount of only $15,000 per month for the software. Making no decision on Amplicon's right to payment, the Court directed Amplicon to file a proof of claim if it wished to collect a greater sum for administrative rent.

Ultimately, CNB rejected its contracts with ATC and ATC took possession of essentially all of the subject property. Thereafter, with reliance on 11 U.S.C. § 365(d)(10), Amplicon renewed its request to compel payment of the balance of rent due for the period after the sixtieth day following the filing of the bankruptcy petition. In relevant part, section 365(d)(10) provides that a trustee or debtor in posses-

sion shall perform such rental obligations "until such lease is assumed or rejected ... unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof." In a memorandum dated February 16, 2001, I held that this court had indeed ordered otherwise when it set the level of adequate protection payments in August of 1999. However, that modification served only to change the requirement for payment of the stated rent during the course of use. The modification did not finally determine Amplicon's administrative claim. Accordingly, I held that Amplicon could properly assert an administrative claim for the unpaid balance of rent. Meanwhile, CNB was also at liberty to challenge that claim, at least for any period of use subsequent to the modification under section 365(d)(10). I therefore set these issues over for consideration at an evidentiary hearing on the allowance of Amplicon's total claim.

On April 26, 2001, this court confirmed a liquidating plan that provided for future payment of the allowed portions of any administrative claims. Among these were two claims that Amplicon had filed. Together, Amplicon's claims presented many complex issues of both fact and law. During the course of extensive hearings on the debtor's objection to Amplicon's claims, this court issued a number of preliminary rulings that eventually led to a resolution of certain aspects of the dispute. In particular, the parties have settled claims arising from the lease of computer equipment. What has yet to be determined is the claim for administrative rent due from the purported lease of the Symix software.

Presently before this court is Amplicon's motion for partial summary judgment, whereby Amplicon seeks a declaration that ATC's purported lease of Symix software is a true lease for which Amplicon should be allowed an administrative claim for post petition rent in the amount of $222,318, together with interest and attorney's fees. To this, the debtor responds that the underlying agreement is not a lease at all. Asserting that the bankruptcy estate has received no benefit of a value in excess of what it has already paid, CNB asks the court to disallow Amplicon's administrative expense claim.

The parties appropriately begin their arguments with a consideration of whether Amplicon's agreement with CNB holds the status of a lease. The special provisions of 11 U.S.C. § 365(d)(10) extend only to leases of personal property. To the extent that the debtor's agreement with Amplicon is something other than a lease, Amplicon's administrative claim would be defined not by section 365(d)(10), but by those provisions of 11 U.S.C. § 503(b) that allow administrative priority for "the actual, necessary costs and expenses of preserving the estate."

■ Throughout most of the proceedings in this case, the parties have assumed that Amplicon, doing business as ATC, held the status of a lessor with respect to the Symix software. Shortly after commencing its bankruptcy, CNB filed the required Schedule of Executory Contracts and Unexpired Leases. In it, the debtor identified ATC as a party to "a computer hardware and software lease agreement." Thereafter, in numerous hearings prior to rejection of its agreement with ATC, the debtor accepted the characterization of the agreement as a lease of personal property. Now, in the context of a challenge to Amplicon's administrative claim, the debtor contends for the first time that its agreement with ATC constitutes something other than a lease of software.

Amplicon asserts that the doctrines of equitable estoppel, waiver and laches pre-

clude a categorization of ATC's agreement with the debtor as anything other than a lease. If this were a non-bankruptcy dispute between Amplicon and CNB, then perhaps these arguments might have warranted a more particular consideration. In bankruptcy, however, the court may always reconsider a claim for cause. 11 U.S.C. § 502(j). Furthermore, CNB's prior assertions cannot bind other creditors. Under the confirmed plan of reorganization, the debtor's primary creditor received stock in a new corporation formed to acquire the assets of CNB. In turn, this new corporation assumed liability for all administrative claims. The allowance of Amplicon's claims, therefore, will impact the new corporation's current owner, that is, a creditor which itself never adopted the debtor's earlier position regarding the existence of a lease. At stake, therefore, are the beneficial rights of a creditor. By objecting to Amplicon's claim, the debtor merely fulfills its fiduciary responsibility to that creditor. In equity, no conduct of CNB should estop the assertion of rights on behalf of entities other than CNB. As in bankruptcy cases generally, the present plan contemplated the opportunity for claim objections until the point of distribution. The prior positions of the debtor will not now preclude an inconsistent argument made not for the debtor's personal benefit, but on behalf of a creditor. Accordingly, CNB's objection to Amplicon's claim is both appropriate and timely.

Amplicon cites the decision of Chief Judge Duberstein in *In re John's Meat Emporium, Inc.*, 176 B.R. 700 (Bankr.E.D.N.Y.1995), as support for the application of the doctrines of laches and equitable estoppel. In that case, the debtor used various motor vehicles during the pendency of chapter 11, but failed to make the lease payments due for those vehicles. Then, after the lessor repossessed the ve-

hicles, the debtor asserted for the first time that the leases should be classified as disguised security agreements. Alleging a lack of lien perfection, the debtor argued that the lessor held only a non-priority unsecured claim. Judge Duberstein rejected this position, and ruled that the doctrines of laches and equitable estoppel precluded the debtor from denying liability for its administrative use of the equipment. What distinguishes the present case is that although CNB may not have articulated the same argument at all times, it has consistently contested Amplicon's claim for administrative rent. Nonetheless, *John's Meat Emporium* speaks to the requisite elements for proof of these defenses. As noted by Judge Duberstein, the doctrine of laches requires a showing of some prejudice to the creditor. 176 B.R. at 704–05. Similarly, equitable estoppel requires conduct that results in a prejudicial change of position. *Id.* at 706. Unlike the circumstances in *John's Meat Emporium*, no conduct of CNB has misled Amplicon to undertake some detrimental action or forbearance. By its decision in the instant matter, this court will accord to Amplicon the same administrative claim to which it has been entitled throughout these proceedings. Finding no prejudice to Amplicon by reason of any position that the debtor now takes, I see no basis for the application of laches or equitable estoppel, even with respect to rights that CNB might assert on its own personal behalf.

Amplicon argues also that prior rulings, such as those regarding the assumption of a purported lease, have established the law of the case regarding the character of ATC's agreement with the debtor. To the contrary, this court has never made any determination about the existence of a lease. Rather, in presenting various issues to the court, the parties

have presumed that status. Indeed, the court was first to raise a concern about the existence of a lease, when it requested argument on that issue in the context of the present dispute. Mistaken notions among litigants do not bind the court. Until the court actually decides a disputed issue, it has established no law of the case with respect to that matter. *Slotkin v. Citizens Casualty Co.*, 614 F.2d 301, 312 (2nd Cir.1979); *In re Johns–Manville Corp.*, 40 B.R. 219, 227–28 (S.D.N.Y.1984).

■ Many are the reasons why ATC's agreement with the debtor should be a lease. Amplicon correctly notes that the agreement is in the form of a lease. Because outstanding covenants with other lenders prohibited additional borrowing, CNB wanted an operating lease under generally accepted accounting principles ("GAAP"). Accordingly, the parties avoided the structure of a disguised security agreement. To this end, the agreement excluded four traditional indicators of a disguised lien. Its term did not equal or exceed the software's economic life; CNB was bound neither to purchase the software nor to renew the agreement for the software's remaining economic life; the agreement contained no option to renew for no or nominal additional consideration; and CNB could not purchase the software for no or nominal additional consideration. Furthermore, in writing, both ATC and the debtor acknowledged the agreement to be a true lease. Despite all of these considerations why the agreement should be a lease, however, Amplicon fails to demonstrate the most fundamental characteristic

of a lease, namely the transfer of a lessor's right to use and possession.

■ Amplicon asserts the application of California law to the present transaction,[1] and cites the definition of "lease" in California Commercial Code § 10103(a)(10). Identical to the text of New York Uniform Commercial Code § 2–A–103(j), this statute defines "lease" to mean "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease."[2] Offering a further clarification is Black's Law Dictionary, which defines a lease as "[a] contract by which the rightful possessor of personal property conveys the rights to use that property in exchange for consideration." *Id.* at 898 (7th ed.1999). Under either definition, the essential concept of lease requires a transfer of some right to use. Implicitly, the lessor must possess some right that the lessor has authority to transfer.

Although ATC may have leased hardware to the debtor, no such arrangement could have occurred with respect to the Symix software. At all times during these transactions, Symix retained ownership of that property. Meanwhile, Amplicon possessed no transferable interest in the software. With respect to that software, Amplicon simply owned nothing that it could have transferred to the debtor. Rather, even before execution of the purported lease, the software's true owner had already granted to CNB a right to its pos-

---

1. The court need not decide the proper choice of law, in as much as the law of Amplicon's place of business (California) is essentially identical to that of the debtor's principal place of business in New York.

2. For purposes of this definition, courts have deemed "goods" to include computer software, both under California law, *RRX Indus-*

*tries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546 (9th Cir.1985), and under New York law, *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425, 432 (S.D.N.Y.1996), *Communications Groups, Inc. v. Warner Communications, Inc.*, 138 Misc.2d 80, 527 N.Y.S.2d 341 (N.Y.Civ.Ct.1988).

session and use. More than five months prior to execution of the purported lease with ATC, Symix and CNB executed the Master License. Pursuant to Paragraph 4.1 of this agreement, Symix granted to CNB "a perpetual, non-exclusive, license to use or permit its Affiliates to use the Product." With full authorization for use of the Symix software, CNB acquired no additional rights from ATC with regard to that property.

Amplicon has directed the court's attention to two invoices which identify various software as being sold to ATC for shipment to CNB. These invoices, however, contain no signatures on behalf of Symix. Acknowledging that the invoices were not designed to transfer ownership of intellectual property, Amplicon asserts in its reply brief that the invoices reflect its acquisition of "tangible software property" such as disks, which ATC then leased to the debtor. Even if true, this interpretation does not change the essential character of ATC's agreement with the debtor. By the terms of that instrument, ATC purported to lease not merely "tangible software property", but the full list of Symix software. While it may have effected the lease of tangible computer property having some minimal value, the agreement fails to achieve the status of a lease with respect to any intellectual property, that being the overwhelming bulk of what the agreement purports to cover.

If properly structured, software leases function as an effective mechanism for access to intellectual property. Counsel for both parties have cited the same treatise for its description of this methodology:

> Software leases are common in three-party and four-party transactions .... In the relevant model in which the lessor plays a role primarily defined in terms of financial, rather than operational, support, the transaction delivers a copy of the software in a transaction in which the lessor makes the acquisition payment and the lessee-licensee uses the software. *When the transaction is fully documented among all three parties, the respective rights of the parties are relatively clear. The licensor transfers a possessory right and a conditional use right to the lessor with the understanding that the lessor will convey the possessory right to the lessee.*

1 RAYMOND T. NIMMER, THE LAW OF COMPUTER TECHNOLOGY, § 8:15 (3rd ed.1997) (emphasis added). In the present instance, the parties failed to fully document the purported transaction. Symix never transferred either a possessory right or a conditional right in its intellectual property to ATC, so ATC had no intellectual property interest that it could transfer to the debtor. With respect to the computer software, the parties could have structured their relationships so that CNB would have acquired rights of Symix through ATC. They did not. Rather, the Master License served as the sole source for the debtor's right to the Symix software.

Amplicon contends that ATC's agreement must be a lease because ATC reserved a right to take possession of the computer software upon default. That, however, does not create a marker unique to a leasing relationship. A power to take possession may exist in many other types of agreement, such as those which establish a security interest. Moreover, taking possession and repossession are legally distinquishable acts. Having no ownership interest in the Symix software, ATC had no right to retain that intellectual property after seizing possession from CNB. The ultimate disposition of the software confirms, therefore, that ATC held something other than the status of a lessor.

██ No lessor may lease that which it does not own or in which it does not enjoy

at least some interest or right of possession. ATC's agreement with CNB may be in the form of a lease, but it is not a lease with respect to any intellectual property. Accordingly, with respect to the Symix software, section 365(d)(10) of the Bankruptcy Code can impose no duty to perform the obligations under a lease that simply does not exist.

Amplicon asserts forcefully that ATC's purported lease does not constitute a disguised security agreement. I concur. The debtor acquired rights to the Symix software pursuant to the Master License, which in paragraph 14 prohibits the assignment or transfer of "all or any part of [CNB's] rights or obligations." Effectively, therefore, CNB held no software interest upon which it could grant a lien. Amplicon errs, however, in its implied suggestion that ATC's agreement must be classified as either a true lease or a disguised security agreement. Rather, this court believes it to be a mere executory contract *sui generis*. This is not to say that the debtor can avoid all liability under its contract with ATC. CNB did not own the software. Clearly, it had no right to retain that software without obligation. What, therefore, is the proper allowance of a claim for the debtor's limited use of the software after the filing of the bankruptcy petition?

■ Pursuant to 11 U.S.C. § 365(g)(1), when a debtor has not previously assumed an executory contract, the rejection of that executory contract constitutes a breach "immediately before the date of the filing of the petition." Accordingly, Amplicon may properly assert a general unsecured claim for damages resulting from the rejection of ATC's contract with the debtor. *See* 11 U.S.C. § 502(g). In addition, however, 11 U.S.C. § 503(b)(1)(A) authorizes an administrative allowance for "the actual, necessary costs and expenses of preserving the estate." Because the debtor's plan will effect only a limited distribution on account of general unsecured claims, the present dispute instead focuses upon Amplicon's administrative claim. Collier on Bankruptcy summarizes well the standard for the allowance of that claim:

Unless a provision of section 365 mandates a different treatment, the general rule regarding the amount of an administrative claim arising from the trustee's use of another entity's property is the amount of the benefit that accrued to the estate as a result of the estate's use of the property. The measure of the benefit to the estate is typically the reasonable rental value of the property that was occupied or used by the trustee....

In determining the reasonable rental value, the amount set forth in the contract or lease will constitute a rebuttable presumption that such amount is the correct measure of reasonable rental value. The presumption, however, can be overcome by the introduction of evidence as to the actual rental value.

4 COLLIER ON BANKRUPTCY, ¶. 503.06[6][c][ii] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2000) (citations deleted). Because CNB does not hold the status of a lessee, section 365(d)(10) cannot impose upon the debtor a duty to pay the full contract consideration under the agreement with ATC. Accordingly, Amplicon's claim is to be set by the general rule allowing administrative priority for the value of the benefit that has accrued to the bankruptcy estate from the use of the property in chapter 11. In this context, the sole remaining issue is whether the debtor has overcome the presumption that the contract consideration establishes that fair value of use.

■ At the trial of this matter, the debtor's president testified that CNB made no use of the Symix software during

the pendency of chapter 11. In choosing not to reject the purported lease, the debtor wished only to preserve the option for its retention by a reorganized entity. As the future ultimately unfolded, the debtor was unable to find a purchaser wanting to use any portion of the facility in which the Symix software was placed. During the reorganizing process in chapter 11, therefore, the Symix software had only a standby value. Meanwhile, Amplicon incurred no loss of opportunity by reason of the debtor's continued possession of the Symix software. CNB's license from Symix was not assignable, and Amplicon possessed no independent right to the software's use. Upon its repossession of the disks, Amplicon was obliged to return the software to Symix, without rebate or recompense. Moreover, the character of computer software differs fundamentally from other forms of personal property, in that software is easily replicated without compromising the utility of any copy. Even if ATC owned the software, CNB's continued possession of the property would impose no limit on other opportunities for its use.

The contract between CNB and ATC established the consideration for a financing of the debtor's use of Symix software for engineering and design purposes. Throughout the pendency of chapter 11, however, CNB never used the software in this fashion. In my view, the debtor has overcome any presumption that the contract payments represent the value of the debtor's more limited use of the software during the period of its administration of the estate. As previously directed by this court, the debtor made adequate protection payments in the amount of $15,000 per month, on account of its retention of the software. In light of the debtor's minimal use of the software and in the absence of any lost opportunity costs to Amplicon, this court can discern no additional fair value for the debtor's post petition use of the Symix software. Because Amplicon has no further claim for payments under the terms of the purported lease, the court must also deny its claim for interest and legal fees.

For all of the reasons stated herein, the court will deny Amplicon's motion for summary judgment but instead, will grant summary judgment to the debtor. Accordingly, the debtor's objection to Amplicon's proof of claim is sustained. With respect to the Symix software, the court disallows any administrative claim in excess of amounts already paid.

So ordered.